jury seemed willing to arrive at any conclusion suggested by the court as necessary to support a verdict for the plaintiff. The evidence upon all the questions of fact submitted to the jury was very slight to rest a finding upon in favor of the plaintiff, but the evidence upon the question of the negligent loading of coal upon the tender, and such negligence causing the injury and death of the deceased, was too slight and unsatisfactory to authorize the finding made by the jury. The defendant had a legal right to use coal that was in some part, at least, in large pieces. It had a right to so load the coal as that it should extend above the edge of the tender to some extent. How this particular piece of coal happened to fall from the tender,—whether from the manner in which it was loaded, or while being transferred from the tender to the fire box, or while other coal was being so transferred,—or how it happened, was a mere matter of conjecture. There were no facts shown from which an inference could fairly be drawn one way or another. There was no proof that the coal was loaded upon this tender in any other than the ordinary way in which such loading was accustomed to be done,—that there was anything extraordinary or negligent in such loading. We do not think it was fairly shown that the piling up was at such a height as to be negligent. Coal is liable to fall from tenders when trains are running at a high rate of speed, and the mere fact that it did fall on this occasion, as stated by the trial justice to the jury, was no evidence that there was negligence in loading the tender on this particular occasion.

The judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.

---

(63 App. Div. 517.)

P. COX SHOE–MFG. CO. v. GORSLINE.

(Supreme Court, Appellate Division, Fourth Department. July 23, 1901.)

1. TORTS OF SERVANT—SCOPE OF AUTHORITY.
   A sewer pipe, which passed under the floor of a basement, became obstructed, and defendant's employés, while taking it up, noticed that water was leaking from a pipe extending from the roof to the floor. Defendant's attention was directed to the leak by one of his men, and he told them to pay no attention to it. The pipe had no connection with the one defendant had been employed to attend to. When defendant went away, one of the men took the cap off the elbow, and water standing in the pipe rushed out, and injured plaintiff's goods. *Held* that, if they believed it a proper thing to do in connection with their work, the master was liable for their acts.

2. SAME—EVIDENCE—RES GESTÆ.
   Statements of the servants just before, at the time of, and subsequent to, the removal of the cap, tending to show their purpose, were admissible as res gestæ.

3. SAME—QUESTION FOR JURY.
   Whether the removal of the cap was an act done out of curiosity, or with the belief that it was proper in connection with the work, was for the jury.

Appeal from trial term, Monroe county.

Action by the P. Cox Shoe-Manufacturing Company against William H. Gorsline. Motion in behalf of plaintiff for a new trial on exceptions taken at a trial in the supreme court. Motion granted.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and RUMSEY, JJ.

James M. E. O'Grady, for plaintiff.
George F. Yeoman, for defendant.

WILLIAMS, J. The motion for a new trial should be granted. The action was brought to recover damages for injuries to personal property alleged to have been caused by the negligence of the defendant. There was upon the trial no dispute as to injuries and the amount of damages, nor was there any dispute as to the employés of the defendant having caused the injury and damage. The whole controversy was over the question whether the acts of the employés were within the scope of their employment, so as to render the defendant responsible therefor. The accident resulting in the injury and damage complained of occurred in the basement of a manufacturing building, on the corner of West and Elizabeth streets, in the city of Rochester, owned by the Rochester Savings Bank, and occupied by the plaintiff. The basement was over 100 feet long along the south side, and 37 feet wide along the west end. The basement floor was covered with cement. A sewer or drain had been laid about 6 inches below the cement bottom, along the south and west walls, 6 or 8 inches from the wall, of pipe about 7 inches in diameter. This sewer or drain emptied into a well hole in the northwesterly corner of the basement, and there was a connection between the bottom of this well hole and the sewer outside the building in the street. This well hole was 6 feet 3 inches long, 3 feet wide, and 2 feet 6 inches deep; its length being from north to south. About 8 feet from this well hole, and near the center of the west wall, was a chimney breast, extending out from the face of the wall 2 feet 5 inches. On the north side of this chimney breast, in the corner between it and the west wall, was a 5-inch iron pipe, which extended from the roof to the basement, entered the cement floor, and passed along under the same to the well hole, and through that to the pipe connecting the well hole with the sewer in the street. The purpose of this pipe was to take the water from the roof, and conduct it to the sewer outside the building. The bend in the pipe under the floor was nearly at right angles, and was liable to get clogged up at the angle with loose stuff washing into it from the roof, so as to set the water back up in the pipe. About two feet above the floor of the basement there was an elbow or Y in this pipe, with a screw cap or plug in the end, and when this cap or plug was removed there was an opening through which any obstruction in the pipe at the angle could be removed. This roof pipe and the sewer under the basement floor were in no way connected with each other, each emptying, independently of the other, into the sewer outside the building. Both were under the floor of the basement, however, before they reached the well hole,

and when the well hole was filled with water the manner in which they were connected with the pipe leading from such hole to the sewer outside the building was not apparent or visible, and at the time of the accident the well hole was full of water. In the early part of May, 1900, the drain or sewer under the basement floor became obstructed so that the water did not run off into the well hole, but oozed up through the floor. The owner, upon being notified there was trouble in the cellar, employed the defendant to ascertain what the difficulty was, and to remedy it. The defendant set one man at work on Saturday, who took up one length of the pipe. Two men were sent on Monday, and as the work progressed it became evident that the sewer, its whole length, would have to be taken up, except a few feet next to the well hole. The two men worked on Monday and on Tuesday, and Wednesday morning three men were at the work. They were common laborers (Poles), and no foreman was with them. The defendant looked after them himself at times. He came there Wednesday morning. The men were working on the south side of the cellar, having finished the westerly end. One of the workmen, Sedor, called defendant's attention to the fact that there was water dripping from the elbow or Y in the iron roof pipe, and asked him to look at it. It was dark where the leak was, but they lighted a match and looked at it. The defendant told Sedor not to touch that at all; that it was not Sedor's business or defendant's; to leave it alone; it was no bother of Sedor's. After defendant went away Sedor said he wanted to know what was in the pipe; that he did not think there was much water in the pipe; that he would make the job good, and be done with it; and directed Tullis, who was working with him, to get a wrench to take off the cap or plug. Tullis got the wrench from some of plaintiff's workmen in the basement, and, applying the wrench to the cap or plug, turned it a little, and the water came out more, and he tightened it up again. Then Sedor took the wrench from Tullis, said he was not afraid to open it, loosened the cap or plug, and the water came out with great force, knocking him down, and causing the injury and damage in question.

Upon these facts, which were not controverted, the nonsuit was granted; the court refusing to submit to the jury the question whether the men were acting within the scope of their authority in opening the roof pipe and letting the water into the basement, and refusing to permit evidence to be given as to why the men opened the pipe, and what they said at the time they opened it, or just before or just after it. It seems to us that the court erred in rejecting some of the evidence offered, and then in taking from the jury the question as to whether the men were acting within the scope of their authority and employment in opening the pipe and letting out the water. "The test of the master's responsibility for the act of the servant is whether the act was done in the prosecution of the master's business, not whether it was done in accordance with the instructions of the master to the servant. When, therefore, the servant, while engaged in the prosecution of his master's business, deviates from his instructions as to the manner of do-

ing it, this does not relieve the master from liability for his acts." Cosgrove .v. Ogden, 49 N. Y. 255, 10 Am. Rep. 361, and cases cited; Quinn v. Power, 87 N. Y. 535, 41 Am. Rep. 392, and cases cited. "For the acts of the servant, within the general scope of his employment, while engaged in his master's business, and done with a view to the furtherance of that business and the master's interest, the master will be responsible, whether the act be done negligently, wantonly, or even willfully. * * * But if a servant goes outside of his employment, and without regard to his services, acting maliciously, or in order to effect some purpose of his own, wantonly commits a trespass, or causes damage to another, the master is not responsible." Mott v. Ice Co., 73 N. Y. 543; Girvin v. Railroad Co., 166 N. Y. 289, 59 N. E. 921. "Where a master claims exemption from liability for the tortious act of his servant while apparently engaged in executing his orders, upon the ground that the servant was in fact pursuing his own purpose, without regard to the master's business, and was acting willfully and maliciously, it is ordinarily a question to be determined by the jury." Rounds v. Railroad Co., 64 N. Y. 189, 21 Am. Rep. 597, and cases cited; Dwinelle v. Railroad Co., 120 N. Y. 117, 24 N. E. 319, 8 L. R. A. 224, 17 Am. St. Rep. 611, and cases cited.

These principles furnish the legal test as to the defendant's liability for the acts of his agents which caused the injury and damages in question. The difficulty arises in applying these principles to the facts of the case. As a matter of fact there was no connection between the roof pipe and the sewer under the floor, so as to make it necessary or proper to meddle with the roof pipe in order to relieve the basement from the trouble in the sewer, but it does not appear that the three men knew this. The roof pipe went into and under the cement bottom of the basement in the immediate vicinity of the drain or sewer, and, the well hole being filled with water, it may not have been apparent to these men whether the roof pipe and the drain or sewer were connected or not. The real question was what they removed the cap or plug for. Did they do it from idle curiosity, to see how much water there was in the pipe; and knowing and understanding that it had nothing to do with the job they were engaged in, the relief of the drain or sewer? Then it was not within the scope of their authority. Did they remove the cap or plug for the purpose and with the view of aiding them in the relief of the sewer, and honestly believing it was a proper thing to do to accomplish the end they were there to accomplish? Then it might be said to be within the scope of their authority. They were evidently not very intelligent men, and were left without any foreman to direct them, and the defendant only looked after them occasionally. The leader in the matter, Sedor, said as he directed the wrench to be brought and as he was about to remove the plug or cap, that he would make the job good, and be done with it. He was asked by the plaintiff at the trial if he took the cap or plug off to help the work there, and, under defendant's objection, was not allowed to answer. One of the other men was asked to state whether Sedor, when he got the wrench on the pipe, said that the

pipe was stopped up, and that was the cause of the trouble, and, under the objection of the defendant, he was not allowed to answer; and again the same witness was asked to state whether Sedor said anything at the time he directed the wrench to be brought about the pipe being stopped up, and that being the cause of the trouble in the sewer, and, under the objection of defendant, he was not allowed to answer. If this evidence had been permitted to be given, it may well have been of such a character as to lead to the conclusion that Sedor's real object and purpose in removing the cap or plug was to aid in accomplishing the end they were seeking, the relief of the sewer. The jury, at least, would have been justified in so finding. The evidence was proper, as being part of the res gestæ of the acts causing the injury and damage, and could only be excluded upon the theory that it was of no consequence what Sedor's object or purpose was in removing the cap or plug. It seems to us, however, it was important to ascertain and determine what the object and purpose was, in order that it might have its fair weight with the jury in settling the question to be determined, whether the acts causing the injury were fairly within the scope of the authority of the defendant's employés. The question was one not free from doubt. It was near the border line, and under all the circumstances, within the principles already stated, was for the jury, and not for the court. All the circumstances should have been admitted in evidence, so far as competent, and the question then left for the determination of the jury.

These men were put there to accomplish a certain end,—the relief of the drain or sewer. They knew what they were there for. It is true they were told just what to do to accomplish the end sought,—to take up the sewer. They were told to leave the roof pipe and plug or cap alone. Still, if they, in their want of judgment and discretion, really believed the removal of the cap or plug would aid in accomplishing the end sought by their master, and they removed the cap or plug for the sole purpose of bringing about the result sought, the relief of the sewer, then clearly, within the principles above stated, the defendant (their master) would be responsible for their acts, which would be within the scope of their authority. We conclude, therefore, that the court erroneously excluded evidence offered by the plaintiff, and erroneously granted the nonsuit in the case.

The motion for a new trial should be granted, plaintiff's exceptions being sustained, with costs to plaintiff to abide event. All concur.