SALVATORE SCANO, Respondent, *v.* TURNER & BLANCHARD, INC., Appellant, Impleaded with HOULDER, WEIR & BOYD, INC., Defendant.

First Department, May 2, 1924.

**Ships and shipping — action by longshoreman against stevedore corporation to recover for injuries suffered while stowing cargo in ship — verdict that there was defect in net used to lower cargo not against evidence — verdict for $4,000 not excessive — plaintiff did not give notice to his foreman of defect in net — undisputed evidence shows that proper equipment was at hand and any failure to use it was act of fellow-servant — complaint to foreman would not have fixed liability on defendant — jury should have been instructed that gangwayman notified by plaintiff of defect was fellow-servant and that notice to him was not notice to defendant — defendant not liable.**

In an action against a stevedore corporation to recover for personal injuries suffered by the plaintiff while he was working as longshoreman stowing a cargo in the hold of a ship the verdict of the jury that the net which was being used to lower the cargo was defective is not against the weight of the evidence.

The verdict for $4,000 was not excessive in view of the nature of plaintiff's injuries.

However, the plaintiff cannot recover and the complaint must be dismissed since it appears that the plaintiff was aware of the alleged defect in the net several

minutes before the accident occurred and failed to notify his foreman thereof, although he did notify the gangwayman of the defect; that the undisputed evidence shows that the defendant had at hand suitable equipment with which to do the work and that if there was any failure to use it that failure was due to the act of a fellow-servant of the plaintiff.

Even though the plaintiff had notified his foreman or superintendent of the defect the defendant would not be liable in view of the fact that it had supplied adequate equipment for the work in hand.

It was error for the court to refuse to instruct the jury that the gangwayman who was notified by the plaintiff of the defect was a fellow-servant of the plaintiff and that a notice to him was not equivalent to a notice to the defendant.

Appeal by the defendant, Turner & Blanchard, Inc., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 16th day of March, 1923, upon the verdict of a jury for $4,000, and also from an order entered in said clerk's office on the 12th day of March, 1923, denying the defendant's motion for a new trial made upon the minutes.

*E. C. Sherwood* [*H. H. Brown* of counsel] for the appellant.

*Alexander Karlin,* for the respondent.

Merrell, J.:

The plaintiff has recovered judgment herein for $4,000 damages, besides costs, amounting altogether to $4,141.70. The judgment is recovered against the defendant Turner & Blanchard, Inc., as compensation for personal injuries claimed to have been sustained by the plaintiff while in said defendant's employ, by reason of the negligence of the latter. The defendant has appealed from the judgment entered and also from the order denying its motion to set aside the verdict as against the weight of the evidence.

The accident occurred on June 16, 1920, at about two o'clock in the afternoon. The original defendants in the action were Turner & Blanchard, Inc., the appellant herein, and Houlder, Weir & Boyd, Inc., the owner of the steamship known as the *Montrose.* At the outset of the trial, upon motion of the plaintiff, the action was discontinued and complaint dismissed as against the owner of the vessel. The action was continued and recovery has been had against the defendant Turner & Blanchard, Inc., a stevedore corporation.

The accident occurred at pier 1, Staten Island. The plaintiff was a longshoreman and was engaged at the time in loading the steamship *Montrose* with a cargo. At the immediate time of the accident the stevedore corporation was engaged in loading in the hold of the *Montrose* a quantity of nails in kegs. For this purpose the defendant, appellant, employed a hoisting apparatus by means

of which the kegs of nails were raised from a nearby lighter, swung around and lowered into the hold of the steamship. This was accomplished by means of a sling or nitch hitch as it was called which consisted of a rope net in which several kegs of nails were placed and which was then brought together, the hook of the hoisting apparatus attached, and the draft then raised from the lighter and lowered into the hold of the adjacent steamship. It was the original allegation of the plaintiff's complaint that the defendant was negligent in failing to supply the plaintiff and his fellow-workmen with safe apparatus for making the transfer of said nails and that the cable and grappling hold used for that purpose were insufficient and improper and that the defendant and its servants and agents were negligent in not properly attaching said nitch string to said merchandise and permitting the same to be loose. A bill of particulars was demanded and served by the plaintiff wherein as to the specific negligence upon which the plaintiff relied it was stated that the defendant was negligent in not using a cable or grappling to hold the merchandise instead of using a rope " and in permitting the rope to be slack and loose." Three or four days prior to the trial counsel for the plaintiff notified the attorney for the defendant that he would ask upon the trial to amend his bill of particulars in certain specified respects and at the opening of the trial, without objection on the part of the attorney for the defendant, the court permitted the plaintiff to amend his bill of particulars so as to allege as follows:

" That the plaintiff will show that the nitch string was not properly attached to the merchandise, that the rope was frail in places, and that this was obvious; that said condition had existed for some time prior to the accident; that the defendant had notice and knowledge of such condition.

" That further by reason of the looseness and frail condition of the rope attached to the net that was holding the merchandise that was then being lowered, that a corner or a portion of the said net tore away; that as a result of the defective condition and appurtenance used for lowering the barrels of nails plaintiff was injured."

The only objection suggested by counsel for the defendant was that he had only received notice thereof on the Saturday before. Asked if counsel for the defendant claimed surprise, he disavowed the same and stated that he was perfect y willing to go ahead and that " it is not a great deal different from what their claim is; it is worded a little differently. I will go ahead." Counsel for the defendant stated that he was not going to raise any point about surprise.

The plaintiff, an Italian, was sworn in his own behalf through an

interpreter and testified that he had been a longshoreman for twelve years and had been for about a year in the employment of the defendant prior to receiving his injuries; that on the sixteenth of June he was engaged in hatch No. 2 on the *Montrose* in receiving and loading barrels of nails; that the net or sling used for the purpose of raising the nails from the lighter and lowering them into the hold of the *Montrose* was made of rope, and that about ten or fifteen minutes prior to the accident he discovered that the rope was worn in one place and called the attention of the gangwayman to that fact. Plaintiff testified that the rope was torn and one of the strands was broken nearly in two at the point indicated. Plaintiff further testified that if everything was working well it only took about a minute to raise a draft of twenty or thirty kegs of nails from the lighter and deposit it in the hold, but that sometimes where there was delay in getting a draft loaded it would take three or four minutes in the operation. He testified that about fifteen minutes after making the complaint and as he was standing upon some of the material which had been loaded into the hold and as his body was about waist-high out of the hold and near the coaming of the hatch, and as a particularly heavy draft of the kegs of nails was being loaded, consisting of thirty to thirty-five kegs weighing from 100 to 120 pounds each, while he saw nothing, he felt the draft strike him and that it jammed him against the side or coaming of the hatch. He testified that he immediately became unconscious and did not regain his senses until he was in the ambulance on the way to the hospital. He was taken to his home at his request, where he was treated by the physician employed by the defendant corporation. Plaintiff describes his injuries and condition following the accident and testified that for about four months he was unable to leave his home, and that when he did attempt to leave and took light employment with the National Biscuit Company as a sweeper, he was only able to work for a short time and was again required to return to bed.

The physician treating him testified as to his injuries and was apparently fair in the testimony which he gave. He testified that when he was called to see the plaintiff he found him in bed with bruises across the abdomen and back and that there was an apparent injury to the sacral iliac joints; that the plaintiff could not turn over in bed and that his condition continued for several weeks. Another physician was called who testified that there had been a permanent injury to the sacral iliac joints and that the plaintiff would never be able to do hard work again. The defendant's physician who treated him described his symptoms with minuteness, stating that he spat blood and also that his urine was bloody, indicating an

injury to the kidneys. Prior to the accident the plaintiff was drawing from fifty dollars to fifty-five dollars a week for his services, or at the rate of eighty cents an hour with one dollar and twenty-five cents an hour for extra work. The testimony as to plaintiff's injuries indicated that they were of a serious nature, and I think the verdict of the jury was not excessive.

The plaintiff's testimony as to the happening of the accident was in a measure corroborated by one other witness, a fellow-workman working by his side in the hold of the vessel in loading the nails, Antonio Guarino by name. The latter witness testified that he was working opposite plaintiff at the time of the accident and, hearing a cry, saw that the draft had fallen and that the plaintiff was hurt. Guarino also testified that he saw that the net was broken; that the puckering string or tightening string about the top of it had been broken and that at the time there was in the draft from thirty to thirty-two kegs of nails. On cross-examination Guarino was not shaken in his testimony, insisting that the net " was broken to one side, it was down,  *  *  *  because the string on one side had broken and the load went on the other side." Guarino further on cross-examination reiterated his testimony to the effect: " It was broken, every strand in it."

As against this testimony of the plaintiff and his corroborating witness, the defendant swore six of the fellow-workmen of the plaintiff: Five of them, all Italians, and testifying through an interpreter, categorically denied that there was any breaking of the rope or sling, but testified that the difficulty came from the failure of the hoist and fall to work properly by means of which the draft was lowered. One of the witnesses and the only one not an Italian sworn by the defendant to dispute the breaking of the net, was Raymond Portal, a Spaniard. Portal spoke English and testified that at the time of the accident he was on the winch used to raise the draft from the lighter to above the deck of the ship. Asked what he knew about the accident, Portal testified that he could not tell anything about it because he was far away from the hatch at the time. He was further asked by counsel for the plaintiff whether, after he saw the plaintiff brought up out of the hold after his injury, he had or had not seen the net that had previously been sent down, and Portal replied that he could not tell as he kept on working. Asked if they continued to use the same net as that in use before plaintiff was hurt, Portal denied knowledge as to that. So that the only witnesses disputing the testimony of the plaintiff and Guarino were the five Italians, most of whom were still in the employ of the defendant. These witnesses of the defendant uniformly testified that the net was not broken, but that the

accident came from the faulty operation of the lowering apparatus. The testimony of the witnesses thus presented a sharp dispute, and we are asked to grant a new trial upon the ground that the verdict of the jury was against the weight of the evidence. We hardly feel justified in setting aside the verdict as against the weight of the evidence. The jury saw the witnesses and was best able to determine the weight to be given their testimony.

However, assuming that the plaintiff's proof preponderated, nevertheless, we do not think that the plaintiff established a cause of action against the defendant. According the plaintiff the most favorable interpretation of the evidence, we think the proofs were insufficient to justify a submission to the jury, and that the complaint should have been dismissed. The plaintiff testified that ten or fifteen minutes before the accident he saw the rope of the net was worn out in one place at the end of the string, the top of the net — the rope that went all around the net, and that he " told this to the gangwayman." Asked on cross-examination why he had not notified the hatch boss of the defect in the net, plaintiff answered that at that moment the hatch boss was not there, but had gone above deck. Plaintiff further testified that the first name of the hatch boss in authority on the day of his injury was " Vincenzo," but that he did not know his name correctly, and that the hatch boss Vincenzo, called on the job " Jimmy," would come down below and tell them what to do; that he was boss of the gang. So far as the evidence discloses, plaintiff made no complaint of the defective condition of the sling to the hatch boss nor did it appear that plaintiff's complaint to the gangwayman was ever transmitted to the hatch boss or any one else in authority.

The undisputed evidence on the part of the defendant was that the employees of the defendant continued to use the same net which plaintiff and Guarino testified had broken, for the rest of the day after plaintiff received his injuries, and that the net was used on the same kind of work until the loading of the ship was finished. The undisputed testimony further showed that the defendant's employees were using two nets and sometimes three in the loading, and that the other nets were in the storeroom on the dock on pier 2, one pier distant from where the plaintiff and his fellows were working; that in this storeroom every kind of gear to load a ship, including the nets, was kept, and if at any time they had a defective net which was broken, all they had to do was to send over there and get a new one, and sometimes they were changed before breaking; that they had a man there whose duty it was to take care of the storeroom and gear and get stuff out as it was needed. In view of the uncontradicted evidence, we are unable to see how the

master could be charged with neglect of duty. Proper and adequate appliances were furnished for the use of the employees in loading the ship, and if there was any failure of duty it was that of plaintiff's fellow-employees concerning a mere detail of the work for which plaintiff's co-employees were alone responsible. There is no claim made nor was any evidence given showing failure on the part of the defendant to provide a competent foreman to direct the plaintiff and his fellow-employees in the loading of the ship. (*McConnell* v. *Morse I. W. & D. D. Co.*, 187 N. Y. 341; *Madigan* v. *Oceanic Steam Navigation Co.*, 178 id. 242; *Depirro* v. *Robins Co.*, 210 id. 93; *Vogel* v. *American Bridge Co.*, 180 id. 373.)

Under the law as enunciated by the foregoing decisions, even though the attention of the foreman or superintendent in charge of the work had been called to a defect in apparatus or appliances used, the master would not have been liable for injuries sustained by workmen where it appeared that the master had supplied other adequate tools, implements or appliances for the use of the employees in the work and which they could have drawn upon, but of which the foreman or those engaged on the work had unquestionably failed to avail themselves. But in the case at bar, even if the defect existed, the plaintiff made no complaint to any one in authority, but merely called the attention of a fellow-workman to the defective net. The plaintiff knew that the person to whom he complained was not his boss, but merely a fellow-longshoreman like himself engaged with the plaintiff in the same work. In no sense can it be said that such fellow-employee was the *alter ego* of the master for whose neglect the master would be liable.

We are also of the opinion that the request of counsel for the defendant that the jury be instructed that the gangwayman to whom plaintiff complained was a fellow-servant of the plaintiff and that any notice of any defect given to the gangwayman was not notice to the master, should have been granted. In the main charge the learned trial justice instructed the jury as follows: " Plaintiff claims that he notified the gangwayman that the rope was broken or frayed; the gangwayman says he did not notify him; it is for you to decide what was the fact on that point." Under such instruction the jury must have assumed that their sole duty was to determine whether the plaintiff or the gangwayman, who denied that the plaintiff made any complaint, was truthful, and that if the jury decided that the plaintiff gave the true version then the defendant was liable. Such assumption was clearly erroneous for the reasons hereinbefore stated and quite overlooked the fact that the gangwayman was merely a fellow-servant of the plaintiff and in no sense the *alter ego* of the defendant. Under the undisputed

evidence in the case, the defendant was entitled to have the jury charged as requested, and we think the court's refusal constituted prejudicial error and would of itself require a reversal of the judgment.

The judgment and order appealed from should be reversed and a new trial granted, with costs to the appellant to abide the event.

CLARKE, P. J., FINCH and MARTIN, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellant to abide the event.