CHARLES W. ANDERSON, Respondent, *v.* INTERNATIONAL MER-
CANTILE MARINE COMPANY, Appellant.

First Department, May 12, 1933.

*Raymond Parmer* of counsel [*Vernon S. Jones* with him on the brief; *Kirlin, Campbell, Hickox, Keating & McGrann,* attorneys], for the appellant.

*Otto H. Droege,* for the respondent.

MARTIN, J.  The plaintiff, while being hoisted from a lighter to the steamship *Mongolia,* received injuries resulting in the loss of his leg due to the fall of a draft caused by the breaking of a rope.

On December 7, 1926, the plaintiff was employed by the Corn Products Refining Company as an inspector of freight, which position he held from 1921 to the date of the accident.  In the performance of his duties as such inspector he visited as many as twenty steamships in a week.  At the time of the accident the Corn Products Refining Company was shipping 4,000 cases of merchandise to California on the steamship *Mongolia* of the Panama

Pacific Line. This freight had been loaded on a lighter of the Corn Products Refining Company at Edgewater, N. J. The lighter was taken to the defendant's pier, No. 61, North river, and was moored on the port side of the steamship *Mongolia*. The cases were placed in drafts and hoisted to the deck of the steamship and lowered into the hold of the vessel. A three-inch rope was used for that purpose.

The steamship *Mongolia* was owned by the Atlantic Transport Company, the Panama Pacific Company being a trade name used by the former company. At the time of the accident the defendant, as stevedore, was loading the steamship *Mongolia* in which, by reason of stock holdings in the Atlantic Transport Company, it owned more than a half interest. The freight which was being loaded was consigned to the Pacific coast, via the Panama canal, and it was the duty of the defendant as stevedore to see that the cargo was properly loaded.

On the day of the accident the lighter deck was about thirty feet below the steamer deck, and while the freight was being hoisted on a draft from the lighter to the steamship, the plaintiff observed that filth from the toilets on the steamship *Mongolia* ran from the scupper holes onto the cases on the lighter. There was danger that the contents of the cases if stowed while covered with this filth would spoil from heat when the vessel went through the tropics.

When the plaintiff observed this condition he went on board the lighter and took out the soiled cases so that they would not be placed in the hold of the vessel. There were but two ways by which the plaintiff could proceed from the steamship to the lighter, either by way of the Jacob's ladder furnished for that purpose, or by the creel or draft. He says that the gangwayman of the hatch asked him if he wanted to go down. When the next draft had been brought up and the cargo removed, the plaintiff got on the creel and was let down to the lighter. He worked on the lighter for several hours taking out the soiled cases and then signaled the gangwayman to take him up to the deck of the steamship. When the next draft of cargo was ready to be taken up it was prepared very carefully. The plaintiff then stepped on the draft, which was then raised up to the ship. When the draft reached the level of the deck of the steamship, the rope broke, and plaintiff fell with the load and received injuries which caused the loss of his leg.

The plaintiff says that the cold made it difficult to use the Jacob's ladder, and that its use was dangerous for a man not accustomed to climbing such a ladder and especially difficult for a man of his years, plaintiff being fifty-eight years of age at the time of the

accident. The plaintiff contends that the ladder being unsafe, his only alternative was to go by the draft, which was the usual custom. The defendant contends that it was not alone an improper way to go to and from the ship but such a practice was forbidden by the rules with reference to same, and that the plaintiff was aware of that fact.

The witnesses for the defendant, in addition to testifying to the fact that the rope used was in all respects adequate, stated that they saw a number of cargo inspectors come upon the ship from time to time, all of whom used the Jacob's ladder whenever it was necessary to go from the ship to a lighter. One of the defendant's witnesses, Cyril Green, stated that when the plaintiff was about to step upon the draft, he warned him not to do so. The reason he told the plaintiff not to use the draft for such a purpose was because it was known to be dangerous to take such chances. He testified that he said to the plaintiff, " Don't you get on that draft."

Another witness for the defendant, Bertie Littlejohn, testified: " I heard Mr. Green say, ' Don't get on it.' * * * Q. You heard Green tell him not to go on? A. I heard him say that."

The defendant contends that there was not sufficient evidence to go to the jury because there was no proof that the defendant had invited the plaintiff to use the creel; that there was no evidence of negligence on the part of the defendant or its employees, and that the doctrine of *res ipsa loquitur* has no application.

We are of the opinion that the charge to the jury, that the rule of *res ipsa loquitur* was applicable to the facts, was erroneous, and if for no other reason the judgment must be reversed because of the charge. The court said: " We all know how the accident happened; the rope broke while the plaintiff was in the creel being hoisted up. That fact speaks for itself. The defendant is called upon to explain. The plaintiff is not in a position to know much about it."

In *Dugan* v. *American Transfer Co.* (160 App. Div. 11) the court said: " So many elements enter into the inquiry as to how a rope comes to break that the fact of its parting, standing alone, does not give rise to the doctrine of *res ipsa loquitur*."

In *Duhme* v. *Hamburg-American Packet Co.* (184 N. Y. 404) the court said: " The parting of the hawser did not speak for itself, as imputing negligence to the defendant, and to leave it to jurors to say whether it was the result of negligence would be to invite them to speculate upon possibilities, without any basis in fact."

There are other very serious questions involved in this case. Although the plaintiff's duties to his principal may have required him to go aboard the lighter, an adequate means to do so was fur-

nished by the defendant. The plaintiff was experienced in this kind of work and knew or should have known the danger of riding on a draft being hoisted to the ship. It was evidently a quick but dangerous method used by those who were unwilling to take a safer course which required a little more effort to make a safe trip to and from the lighter.

The plaintiff says he was invited to use the draft. He testified: " Captain Peterson was the Captain of Marine Lighter ' 36,' and while I was talking to him, the gangwayman of this hatch, that is the man who has charge of the rope — he outrightly asked me if I wanted to go down. He said ' Wait until the next draft comes out, and I will take you down,' and then it come out of the deck of the ship, it landed on the deck of the ship, and he told me to get on there, and he said to the man at the winch ' Go ahead easy and let this man down,' and I went down there."

It is now contended by plaintiff that the important question in this case is whether he was invited by the defendant to use the sling or creel to go down from the steamship *Mongolia* to the lighter. The trial court was of the same opinion. The defendant's contention is that the gangwayman had no authority to allow plaintiff to use the creel either in going to or coming from the lighter and that positive instructions had been given not to permit any one to use the creel.

John O'Neill, the assistant general superintendent of piers of the defendant, testified that he had general charge of the longshoring operations of the defendant. Part of his testimony on this point is as follows: " Q. Have you ever observed any custom with regard to the use of the ship's falls or the ship's tackles to transfer men from one to the other? A. Our company don't allow it. If it is done, it is done at the man's own free will, but not with permission of the company. Q. Have you observed any custom — A. It is being done — I have seen it. Q. Does you company issue instructions not to have it done on your piers? A. Yes, sir."

The defendant also called as a witness Jesse Markey, the assistant stevedore of the defendant and the man who had charge of hiring men, loading and discharging the ships. He testified as follows: " Q. What are the instructions of the company for which you work with regard to using cargo falls for transporting human beings? A. Not to ride anybody down on falls, either in a hatch or over the side, or over the dock — that is instructions right from our office to myself and from myself to the foreman, and from the foreman to the various men underneath me."

Mr. Charles Waldon, the assistant foreman to the stevedores, and also an employee of the defendant, testified that instructions

had been given that men were not to use the cargo fall in going up the side of the vessel. He testified as follows: " Q. What are your instructions? A. Our instruction is that men should go up and down the Jacob's ladder on the side of the ship. Q. Have you seen men use the cargo fall? A. No, sir, we don't allow any men to use the cargo fall. Q. You mean the men under you? A. On that line."

The plaintiff says that the question whether the act of the gangwayman was done in promoting his employer's business was a question of fact for the jury and cites *Casey* v. *Davis & Furber Machine Co.* (209 N. Y. 24) as authority for that proposition. That may be so in some instances but that rule does not apply in this case. Here the defendant had nothing to do with the plaintiff or plaintiff's work. If plaintiff had never appeared on the scene the cargo would have been loaded and stowed by the defendant.

In *Cox Shoe Mfg. Co.* v. *Gorsline* (63 App. Div. 517) the court said: " ' The test of a master's responsibility for the act of his servant is, whether the act was done in the prosecution of the master's business; not whether it was done in accordance with the instructions of the master to the servant. When, therefore, the servant, while engaged in the prosecution of the master's business, deviates from his instructions as to the manner of doing it, this does not relieve the master from liability for his acts.' (*Cosgrove* v. *Ogden*, 49 N. Y. 255, and cases cited; *Quinn* v. *Power*, 87 id. 535, and cases cited.)"

The defendant's liability appears to have been predicated upon the theory that the sole question was whether the invitation by a gangwayman to ride upon the creel was or was not given. The court assumed that if such an invitation was given the defendant was liable. This plaintiff was not doing any work for the defendant. He was working for his own employer. Nothing he was doing had any connection with defendant's work. The defendant was to take the cargo from the lighter and store it in the hold of the ship. If the owner of the goods saw fit to have an inspector watch the storing of the goods, so that it would be in a position to know that when the goods were delivered on board they were in good condition, that had nothing whatever to do with the defendant's business. The plaintiff was attending to his own work and his master's business and it was the duty of his master to see that he had the means of doing the work that he was called upon to do. Furthermore, his place was on the steamer. It was only because of an emergency and of his desire to help his own employer that he went onto the lighter. The permission alleged to have been given by the gangwayman was not in furtherance of his master's business.

The erroneous theory which seems to have been followed by the court and by the plaintiff was that this work was being done for the defendant. While the loading was being done in behalf of the defendant, the inspector's work was being done in behalf of his own master and had nothing whatever to do with the defendant.

Even if that were not true, the gangwayman had no right whatever to bind the defendant, especially in violation of the rules, by telling the plaintiff he could ride on the creel, instead of going down or coming up by way of the Jacob's ladder placed alongside the boat. The direction of the gangwayman was not binding on the defendant, especially in view of the fact that there were rules prohibiting any one from riding on the creel. (*Scano* v. *Turner & Blanchard, Inc.*, 209 App. Div. 41.)

In *McDonough* v. *Pelham Hod Elevating Co.* (111 App. Div. 585) the court held that where an employee of another concern rode on a hodhoist and was injured, the burden was on him to show that he was rightfully upon the elevator with the defendant's permission, express or implied; that such permission was not shown by the fact that defendant's engineer consented that the plaintiff should ride, unless it was within the scope of his authority, which it was not, he being employed only for the special purpose of running the elevator for carrying material and not for carrying passengers.

This court dismissed the complaint, citing *Morris* v. *Brown* (111 N. Y. 318), where the court said: " It is a general proposition that a master is chargeable with the conduct of his servant only when he acts in the execution of the authority given him. * * * The deceased had, in fact, ridden upon the car; he had done so under no other permission, a volunteer, but in safety. In each instance, however, he must be deemed to have assumed the risk, and this last time he was unfortunate. The consequences of that misfortune should not be thrown upon the defendants."

The judgment is erroneous and should be reversed, with costs, and the complaint dismissed, with costs.

FINCH, P. J., MERRELL, McAVOY and SHERMAN, JJ., concur.

Judgment reversed, with costs, and complaint dismissed, with costs.